IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JON R. DEUTSCH | § | |
| | § | |
| VS. | § | A-16-CV-72 RP |
| | § | |
| PAUL BO YU, et al. | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE ROBERT PITMAN
      UNITED STATES DISTRICT JUDGE

Before the Court is the Defendant Paul Bo Yu, et al.'s Motion for Summary Judgment, Dkt. No. 14, and Plaintiff Jon R. Deutsch's Response in Opposition to Motion, Dkt. No. 21. The District Court referred the above-motion to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules. The Court held a hearing on the motion on August 25, 2016.

### I.  BACKGROUND

This suit is one of nearly 400 that the Plaintiff, Jon R. Deutsch, has brought against small businesses in Austin, Texas. In each complaint, Deutsch alleges that he attempted to visit the business but could not access it because he is disabled. Accordingly, he has brought suit under Title III of the Americans with Disabilities Act, 42 U.S.C. §§12181, et seq. ("ADA"), and its attendant regulations, the Americans with Disabilities Act Accessibility Guidelines, the Texas Accessibility Standards, promulgated under the Texas Architectural Barriers Act Case, TEX. GOV'T. CODE §469, and Chapter 121 of the Texas Human Resources Code, TEX. HUM.RES. CODE §121.001 et seq.

The Defendants in this case, Paul Bo Yu and Jiang Yan-Qing are the landlord for Boomerz, a pool hall and bar. Deutsch alleges that in "September of 2015" he patronized Boomerz. Dkt. No.

1 at 8. He states that he "experienced difficulty and discomfort" during his visit, "encountering and dealing with the lack of an accessible facility." *Id.* He states that

> The Defendant's Austin location does not have the required number of ADA parking spaces. With 1-25 parking spaces, Defendant must have at least one ADA-Compliant Van Accessible space (96" Wide with 96" Side Access Aisle). This space must be located close to the entrance of the business. Additionally, the business has a threshold that exceeds ½" in violation of the ADA.

*Id*. at 8-9. Deutsch has embedded photographs of the business's parking lot in his complaint. *Id.* at 4-8. These architectural barriers "denied the Plaintiff full and equal access to facilities, privileges and accommodations offered by the Defendant." *Id*. at 8. He alleges that "the failure to remove the barrier was intentional" as it was "intuitive and obvious, . . . the Defendant exercised control and dominion over the conditions at this location," and "had the Defendant intended any other configuration, it had the means and ability to make the change." *Id.* Deutsch therefore seeks an injunction compelling Bo Yu and Yan-Qing to restripe the parking lot in order to add the required numbers of accessible parking spaces and modify the building by installing less than ½" thresholds at the entrance. Deutsch also seeks a declaratory judgment that Bo Yu and Yan-Qing are not in compliance with the ADA. Finally, Deutsch seeks statutory damages of at least $300 per violation of Tex.Hum.Res. Code §121, his costs and attorney's fees.

Bo Yu and Yan-Qing have brought a motion for summary judgment in which they argue, *inter alia*, that Deutsch lacks standing to bring his claim. Dkt. No. 14 at 4-9. Because this is not the only of Plaintiff's suits currently referred to the undersigned where standing is raised, the Court set an evidentiary hearing to determine whether it had jurisdiction, and combined the hearing with several other of Deutsch's cases in which a standing argument was raised. Dkt. Nos. 23, 28. The

hearing was begun July 15, 2016, suspended due to the contemptuous behavior of Deutsch's counsel, and then resumed and completed on August 24, 2016.

## II.  STANDING UNDER THE ADA

Federal courts are tribunals of limited subject matter jurisdiction and may only entertain a case that fits within the judicial power of Article III of the Constitution and a statutory grant of subject matter jurisdiction, such as federal question jurisdiction under 28 U.S.C. § 1331 and diversity of citizenship jurisdiction under 28 U. S. C. § 1332(a)(1).  13D CHARLES ALAN WRIGHT, ARTHUR R. MILLER. EDWARD H. COOPER, & RICHARD D. FREER, FEDERAL PRACTICE AND PROCEDURE § 3567 (3d ed. 2008).  Subject matter jurisdiction includes the "irreducible constitutional minimum of standing," which has three elements:

> First, the plaintiff[s] must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant[s], and not . . . th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  The party invoking federal jurisdiction bears the burden of proof for establishing these elements.  *Id*.  Where a plaintiff seeks declaratory and injunctive relief, as in this case, the plaintiff must also show a significant possibility of future harm; it is insufficient to demonstrate only past injury.  *See O'Shea v. Littleton*, 414 U.S. 488, 495 (1974).  Mere "'someday intentions'—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564.

3

In the context of ADA claims, most courts evaluate whether future injury is probable by determining whether the plaintiff is likely to return to the defendant's business. *E.g., Cortez v. National Basketball Association*, 960 F. Supp. 113, 117-18 (W.D. Tex. 1997) (finding that a plaintiff lacked standing because she failed to allege that she intended to return to the defendant's events in the future). Courts have frequently dismissed ADA cases where the plaintiff offered only vague allegations and testimony about a future plan to visit a defendant's property. *See, e.g., Shotz v. Cates*, 256 F.3d 1077, 1082 (11th Cir. 2001) (holding that plaintiffs lacked standing because they did not allege that they intended to return to a courthouse, and thus faced no "real and immediate threat of future discrimination."). When analyzing a plaintiff's likelihood of return, courts usually consider:

(1) the proximity of the defendant's business to the plaintiff's residence,
(2) the plaintiff's past patronage of the defendant's business,
(3) the definiteness of the plaintiff's plans to return, and
(4) the plaintiff's frequency of travel near the defendant.

*D'lil v. Stardust Vacation Club*, 2001 WL 1825832, at *3 (E.D. Cal. Dec. 21, 2001). Post-suit efforts to bolster standing cannot help, because the court must judge standing based on the facts at the time the suit is filed. *See Access 4 All, Inc. v. Wintergreen Commercial P'ship, Ltd.*, 2005 WL 2989307 at *3 (N.D. Tex., Nov. 7, 2005). *See also Moyer v. Walt Disney World Co.*, 146 F. Supp. 1249, 1253 (M.D. Fl. 2000) (plaintiff's visit to business after complaint was filed did not confer standing); *Brother v. Tiger Partner, LLC*, 331 F. Supp. 2d 1368, 1373 (M.D. Fla. 2004) (that plaintiff made a reservation at defendant's hotel after the complaint was filed was insufficient as standing is determined as of the date the suit is filed).

Some courts have rejected the "intent to return" theory, and have instead relied on what has been described as the "deterrent effect" doctrine to determine whether a Title III plaintiff has

4

established standing. Under this theory, a disabled individual suffers a cognizable injury if he is deterred from visiting a noncompliant public accommodation because he has encountered barriers related to his disability there. *Chapman v. Pier 1 Imports*, 631 F.3d 939, 950 (9th Cir.2011). "Just as a disabled individual who intends to return to a noncompliant facility suffers an imminent injury from the facility's existing or imminently threatened noncompliance with the ADA, a plaintiff who is deterred from patronizing a store suffers the ongoing actual injury of lack of access to the store." *Id.* (internal quotation marks and citation omitted). "This theory is predicated on the ADA's language that a plaintiff need not 'engage in a futile gesture if such person has actual notice that a person or organization . . . does not intend to comply" with the ADA. *Hunter v. Branch Banking and Trust Co.*, 2013 WL 4052411 at *3 (N.D. Tex., Aug. 12, 2013) (quoting 42 U.S.C. § 12188(a)(1)).

In *Betancourt v. Ingram Park Mall, L.P.*, 735 F.Supp.2d 587 (W.D. Tex. 2010), Judge Rodriguez of the San Antonio Division of this court wrote at length on the two theories, contrasting them and the rationales underlying each. In his view, the proper construction of the ADA requires taking a "broader view" of the constitutional standing requirement in ADA Title III cases involving architectural barriers. Thus, he opined that standing would exist "so long as the alleged discriminatory barriers remain in place, the plaintiff remains disabled, and the plaintiff is 'able and ready' to visit the facility once it is made compliant," adding "any disabled plaintiff who alleges that she is being denied the opportunity to visit or is currently being deterred from visiting a public accommodation that is violating Title III alleges sufficient present injury in fact for prospective equitable relief." *Id.* at 604. Importantly, even under this broader view, to have standing the plaintiff "must at least prove knowledge of the barriers and that they would like to visit the building in the imminent future but for those barriers." *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir.2000).

Thus, under either theory, a plaintiff must demonstrate an intent to visit the defendant's business in the future. *Hunter,* 2013 WL 4052411 at *3.

Deutsch contends that the Fifth Circuit endorsed the broader of the two standing approaches in *Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011), a Title II ADA case cited in his briefing. Because an intent to return to, or visit, the defendant in the future is required under either theory, whether that assessment of *Frame* is accurate is not crucial to the Court's decision. It is, however, instructive to examine the issue briefly. The questions presented in *Frame* were two: the applicability of Title II to public sidewalks, and when the statute of limitations for a private citizen's Title II suit begins to run. *Id.* at 221. Thus, standing was far from the heart of the decision. The case does include, however, this one-paragraph discussion on the topic:

> The City contends that the plaintiffs lack standing with respect to inaccessible sidewalks they have not personally encountered. To be sure, Article III standing requires a plaintiff seeking injunctive relief to allege "actual or imminent" and not merely "conjectural or hypothetical" injury. Mere "some day" intentions to use a particular sidewalk, "without any description of concrete plans," does not support standing. But "imminence" is an "elastic concept" that is broad enough to accommodate challenges to at least some sidewalks that a disabled person has not personally encountered. For example, a plaintiff may seek injunctive relief with respect to a soon-to-be-built sidewalk, as long as the plaintiff shows a sufficiently high degree of likelihood that he will be denied the benefits of that sidewalk once it is built. Similarly, a disabled individual need not engage in futile gestures before seeking an injunction; the individual must show only that an inaccessible sidewalk *actually affects his activities in some concrete way*. On remand, the district court will be able to apply established standing doctrine to weed out any hypothetical claims. At this point, however, *the plaintiffs have alleged in detail how specific inaccessible sidewalks negatively affect their day-to-day lives* by forcing them to take longer and more dangerous routes to their destinations. This is sufficient to support their right to sue.

*Frame*, 657 F.3d at 235-36 (emphasis added; footnotes omitted). Because the *Frame* decision was not focused on the standing requirements for a Title III ADA claim, it is difficult to conclude from this single paragraph whether the Fifth Circuit would follow the "deterrent effect" line of cases, or

the "intent to return" theory if squarely faced with that question. Regardless, even reading the language of *Frame* liberally, the court required that to have standing a plaintiff must set out facts sufficient to explain in some detail how the alleged deficiencies "negatively affect their day-to-day lives," and held that mere allegations of non-compliant facilities were insufficient. Thus, while *Frame* stands for the principle that a disabled plaintiff need not traverse a rocky road to prove that a missing sidewalk renders it inaccessible, he must nonetheless show that the inaccessible feature "actually affects his activities in some concrete way." *Id*. at 236.

### III.  FACT FINDINGS AND ANALYSIS

Deutsch's complaint is silent with regard to where within Austin he resides, or his residence's proximity to any of the businesses he has sued. It is also silent regarding his history (if any) of patronizing the business, or whether he intends to return to it. Indeed, the dearth of evidence in the record relevant to the standing analysis is what led the Court to set an evidentiary hearing on the issue. In addition to the documents attached to the parties' pleadings, the evidence submitted at the hearing was the testimony of the Plaintiff, Jon Deutsch, as well as one exhibit. Oddly—given that the Plaintiff bears the burden of demonstrating standing to sue—Deutsch's counsel submitted no evidence, and asked Deutsch no questions.

In his testimony, Deutsch was questioned about the facts he contends support his standing to sue. The hearing was a combined hearing, covering standing issues in four cases:

> *Deutsch v. Travis County Shoe Hospital, Inc.,* A-15-CV-1198-LY
> *Deutsch v. Paul Bo Yu, et al.,* A-16-CV-72-RP
> *Deutsch v. Annis Enterprises, Inc.*, A-16-CV-97-LY
> *Deutsch v. David Throckmorton,* A-16-CV-112-SS[1]

---

[1] Deutsch has filed a motion asking for leave to dismiss his case against David Throckmorton (A-16-CV-112-SS). Throckmorton opposes the motion, as he is seeking sanctions against Deutsch.

Attorneys for all four defendants questioned Deutsch. While the relevant facts are in some instances specific to each case, the vast majority of the evidence relevant to standing is common to all of the cases. Thus, the Court has not parceled out its fact findings between the cases, but instead makes findings common to all three of the cases.

Deutsch was first questioned by counsel for Annis Enterprises, Inc., the landlord for the Color at Dawn, a women's hair salon. Deutsch testified that he attempted to visit Color at Dawn on September 23, 2015. *Transcript of August 24, 2016 Hearing,* Dkt. No. 37 at 10. He stated that he did not call the salon in advance, but rather "just dropped by." *Id*. at 11. Asked what services he needed at a women's hair salon, Deutsch stated that it was "coming up on" his wife's anniversary (presumably his anniversary as well) and that he was "going to get her a hair coloring." *Id*. He further stated that he never exited his car at the location, as he could tell from looking out of the car that he could not access the salon and that the parking lot did not comply with the ADA. *Id*. He conceded that he could have called and made an appointment for his wife, but did not. *Id*.

Deutsch testified that he visited the Austin Shoe Hospital on August 28, 2015, in order to get a pair of boots resoled. *Id.* at 13. He stated that he did not enter the premises because he "parked there, and someone parked next to [him] and he couldn't get out." *Id*. He testified that he had not been to that location before, and he has not been back since that day. *Id*. Asked if he had any intention to return to the business he responded, "perhaps, if service is needed." *Id*. When pressed as to if he had any specific intention to go back, Deutsch responded "no, sir." *Id*. at 14. When asked

---

Though the Court allowed counsel for Throckmorton to question Deutsch regarding standing (since the merits of the standing issues could conceivably be relevant to the sanctions issue), given the pending dismissal motion the Court will not be making a recommendation on the standing issues in that case.

whether he was aware of any changes made in the parking lot since August 28, 2015, he stated that he drives by the location "every day" and he did not believe that any new work had been done to provide a van accessible space in the parking lot. *Id*. at 15. In fact, the evidence in the record reflects that a van accessible spot was added to the parking lot roughly six months before the hearing. Dkt. No. 6-1 in A-15-CV-1198 LY.

Deutsch testified that he attempted to visit Boomerz on September 23, 2015 (the same date as the visit to the Color at Dawn salon). Dkt. No. 37 at 17. Asked if he planned to go back to Boomerz he stated that he had "no objections to going back to Boomerz." *Id*. at 18. He stated that he was sure he had been past the parking lot since the suit, as he goes to Oak Hill regularly, but he had not noticed any changes to it. *Id.* at 19. He also stated that he drove either a Honda or a pickup truck, not a van with a lift. *Id.* at 18. On the question of what he found non-compliant at Boomerz, he stated:

> A. There's no signs, and there was people parked in the white zone.
> Q. Okay. So you're saying -- you said you were there on September 23rd. Is that your testimony today?
> A. Yes.
> Q. And are you aware that that's a Wednesday, correct?
> A. Yes.
> Q. And so what time about were you in the parking lot?
> A. Just in the evening time.
> Q. In the evening. It wasn't the afternoon?
> A. No, sir.
> Q. Okay. So you're stating that the entire parking lot was full on a Wednesday evening; is that right?
> A. That's not what I'm stating.
> Q. Okay. What are you saying, then?
> A. I was saying that I couldn't park in the handicap spot. It was inaccessible.
> Q. Okay.
> A. There was no sign.
> Q. Okay. And do you remember how many spots you allege were in that parking lot?
> A. I believe there's two.

9

*Id.* at 55. The evidence shows that in fact there were six disabled spots in the parking lot on the date in question, albeit lacking signs or full access aisles. *See* Dkt. Nos. 14 at 6-7; and 14-11 to 14-16. Moreover, Deutsch's testimony at the hearing is inconsistent with his sworn affidavit filed in response to Boomerz's motion for summary judgment. In that document he stated that he visited the business "on the afternoon of September 24, 2015" (not the evening of September 23, 2015), and "[a]t the time, I was not able to find any disabled parking as the business had zero disabled parking signs." Dkt. No. 21-1. He further stated that

> "[a]lthough I attempted to exit my car and enter the business, I was unable to as another car was parked next to me and I could not take my wheelchair out of my vehicle. There was no access aisle that allowed me to park, remove my wheelchair, and enter the business. The ramps also looked too steep for me to go over in my wheelchair."

So Deutsch claims both that he "was unable to find any disabled parking as the business had zero disabled parking signs," suggesting he made no attempt to park, but also claims in his affidavit that he did park, but was unable to exit his car because "another car was parked next to me" (which, coincidentally, is exactly what he testified happened at the Austin Shoe Hospital). In either event, it appears that Deutsch never exited his car. Further, he states in his affidavit that the access ramps "looked too steep," again suggesting he remained in his car when he visited Boomerz. Finally, as with the Austin Shoe Hospital, Deutsch's testimony regarding the corrective action that has since been taken was incorrect, as remedial changes were made in April and May 2016. *See* Dkt. Nos. 14-2, 14-10 to 14-16.

An issue that has come up in many of Deutsch's cases—and that was raised at the hearing—is the fact that it appears that the defendants named in the 385 lawsuits Deutsch filed in

10

this court between May 2015 and March 2016 came from a list of potential targets created by his attorney:

> Q. Okay. And is it true that your attorney provides you with a list of properties to visit?
> A. We work together on the list.
> Q. Okay. And so would you know if this property was one of those properties on that list?
> A. I couldn't tell you. I don't know.
> Q. Okay. So there's a possibility that you only visited Boomerz because it was on this list; is that right, since you don't remember?
> A. Your words, not mine.
> Q. So either you remember that it's on the list or it's not. So is it on the list?
> A. I don't remember if it's on the list. Like I said, we work together on the list.
> Q. Okay. And what's the criteria for this list? How is this list created?
> A. It's the places that I go that I can't get into.
> Q. Okay, and how does your attorney work with you on that list? What does he add to it?
> A. Say again?
> Q. How does your attorney add to this list? You said that you work together.
> A. He adds some locations as well.
> Q. Okay, so you're saying your attorney goes to locations and finds them non-compliant and then tells you that they're not compliant. Is that right?
> A. Yes.

Dkt. No. 37 at 19-20.

This list has been the focus of several motions in other cases filed by Mr. Deutsch, and ultimately Judge Lane ordered that the list (or "log") be filed for *in camera* review by the court, in a manner showing which portions of the log were created by the attorney and which were Deutsch's work. On that point, in a deposition in one of the cases before Judge Lane, testimony was elicited by Mr. Deutsch's attorney from Mr. Deutsch about a document identified as the first page of the log. That same document was admitted at the hearing as a portion of Defendant's Exhibit 1, and is reproduced here:

ADA VISITS

| Place | Addy | Date Visited | Time |
|---|---|---|---|
| FEDEX Office on Burnet (no Van Accessible space) | 9222 Burnet Road Austin (on Burnet above 183) | | |
| Taquerias Arandinas (no Van Accessible space) | 700 West William Cannon Drive (corner of Cannon and South 1st) | 2/21/15 | 2:55 |
| EZ Food Store/ Texaco Gas Station (no Disabled parking) | 719 W William (corner of Cannon and South 1st) | 2/21/15 | 1:45 |
| Domino's Pizza (no Disabled parking) | 719 W William (corner of Cannon and South 1st, further down shopping center) | 3/14/15 | 6:47 pm w/ wife |
| Public Storage (no Disabled parking) | 7200 South 1st St, Austin | 2/21/15 | 3:19 |
| Austex Food Mart/ Conoco (no Disabled parking) | 1913 West Ben White (corner of Ben White & Manchaca) | 2/21/15 | 1:15 |
| Taqueria Los Jaliscienses (no Disabled parking) | 1815 West Ben White Blvd (Ben White & Merle) | 2/21/15 | 3:52 |
| Jiffy Lube (no Disabled parking) | 1705 West Ben White Blvd (corner of Ben White & Russell Drive) | | |
| Souper Salad (no Disabled parking) | Lakehills Plaza, 4211 South Lamar Blvd | | |
| Arby's (no Disabled | 4411 South Lamar | 3/18/15 | 3:00 no prkg. |
| Ames Insuran | S. Congres | 2/21/15 - 31 | 431 no access from curb. |

In the deposition mentioned above, the following testimony was elicited about this document:

>   MR. HARRINGTON : Okay. Exhibit 1 is what now, for the record?
>   MR. ROSALES : For the record, Exhibit 1 is the -- well, let me ask Jon. Jon , I'm showing you a paper right now. The top of it says "ADA visits." Do you recognize this paper ?
>   THE WITNESS : Yeah.
>   MR . ROSALES : Can you, please, tell us what the document is? What the paper is?
>   THE WITNESS: As far as –
>   MR . ROSALES : What is it? I mean, yeah --
>   THE WITNESS : It's just places that I visit timely.
>   MR . ROSALES : Okay. And is this your --is this your handwriting?
>   THE WITNESS: Yeah.
>   MR . ROSALES : I'm showing you the original right now. And then these are just places and times that you visited; is that correct?
>   THE WITNESS: Yeah.

12

> MR . ROSALES: Okay. And then at the very bottom, it's column -- I should say Row 1, 2,3, 4, 5, 6, 7, and that's for this lawsuit, which is Taqueria Los Jaliscienses. Is that also correct, No . 7?
> THE WITNESS: Yeah.
> MR . ROSALES:  Okay. And you wrote that.  I didn't --
> THE WITNESS : Yeah.
> MR. ROSALES:  I didn't write that, you wrote that, correct?
> THE WITNESS :  Yeah.

Dkt. No. 49-1 at 15-16 in A-15-CV-490 LY.  Thus, there does not appear to be any dispute that the typewritten information in the columns titled "Place" and "Addy" were prepared by the attorney, while the dates and times (which appear in handwriting) were written by Deutsch.  Though only one page was admitted at the hearing (as it is the only page so far produced by Deutsch in discovery), the full log is 28 pages long, with roughly 8 of those pages being totally handwritten (apparently by Deutsch), with the rest being in the table format of Defendant's Exhibit 1.  *See* Dkt. No. 52 in A-16-CV-088 LY.  From this evidence, it appears that, notwithstanding his testimony to the contrary, the primary—if not sole—reason Deutsch visited the defendant's businesses is that he was directed there by his attorney.

Moreover, Deutsch's demeanor while testifying was notable.  He was in many instances flippant, and acted as if the proceeding was a game.  The following are examples of this:

> Q.	(BY MR. HARRINGTON) Okay. So you sue this hotel on North I-35, Days Inn. Why?
> A.	Accessibility.
> Q.	Yeah, yeah. But why did you sue it? Were you going to stay there?
> 	MR. ROSALES: Objection, Your Honor.
> 	THE COURT: Overruled.
> 	MR. ROSALES: It has nothing --
> Q.	(BY MR. HARRINGTON) Were you going to stay there?
> A.	Sure.
> Q.	You were?
> A.	Sure.
> Q.	Why?
> A.	Why not?

Dkt. No. 37 at 29-30.

> Q. . . . What about the real estate agents? Are you planning to move?
> A. Anything is possible.
> Q. Pardon?
> A. Anything is possible.
> Q. Yeah. I didn't ask you that. Are you planning to move?
> A. I can't predict on the future.
> Q. Why would you go to a real estate company, then -- all of these real estate companies that you sue?
> A. Inaccessible. Not up to compliance.
> Q. Yeah. But why would you go there other than you want to sue them?
> MR. ROSALES: Objection, Your Honor. Not about the --
> THE COURT: Overruled.
> MR. ROSALES: -- not about the Throckmorton case.
> Q. (BY MR. HARRINGTON) The answer? Why would you go to real estate companies if you weren't planning on moving?
> A. Maybe looking for property.
> Q. Yeah. Were you when you went there looking for property?
> A. Sure.
> Q. Like what kind of property?
> A. Investment property.
> Q. Uh-huh. You have money to invest?
> A. Sure.

*Id.* 47-48.

Further, in many instances Deutsch had little or no knowledge of the entities he had sued, or why he had allegedly visited them:

> Q. (BY MR. HARRINGTON) Why did you go to Worley parking -- Printing?
> A. I don't recall at the time.
> Q. You don't recall?
> A. That's what I said.
> Q. How many times have you gone before?
> A. Never.
> Q. I -- excuse me if I already asked this. Did I ask you why you went to the Worley Publishing Company [sic]?
> MR. ROSALES: Objection, Your Honor. I mean --
> THE COURT: Overruled.
> Q. (BY MR. HARRINGTON) Did I ask you that?
> A. No, sir.
> Q. Why did you go there? Do you have a book to publish?

14

> A. No, sir.
> Q. Why did you go there?
> A. I don't recall.
> Q. You don't recall?
> A. No, sir.
> Q. Have you gone back to Worley?
> A. No, sir.

*Id.* at 45-46. Indeed, Deutsch was unable to identify a single one of the 385 businesses he has sued that he had returned to after settling with them, or after suing them:

> Q. (BY MR. HARRINGTON) So of those 385 cases that you filed, how many -- tell us specifically which places you've gone back to since you sued them.
> A. I can't think of any off the top of my head, sir.
> Q. Right. Did you go back to the strip club you sued?
> Q. (BY MR. HARRINGTON) Did you? Did you go back to the strip club that you sued?
> A. Which one?
> Q. You sued more than one?
> A. I don't know. Which one are you talking about?
> Q. Did you sue more than one strip club or one?
> A. I don't know, sir. You have all the cases in front of you.
> Q. No. You're the plaintiff here. Did you file more than one case against a strip club or just one?
> A. Just one.
> Q. All right. Did you go back to it?
> A. No.
> Q. How many times had you gone to the strip club before you filed the lawsuit?
> A. Are we talking about when I was walking around, or before -- after my disability?
> Q. After your disability.
> A. I haven't.
> Q. So you've never been there, you get a list from your lawyer, you go, and then you never go back. Right?
> A. Sure.

*Id.* at 27-28.

And that, in a nutshell, is what the cases before the Court are comprised of—randomly selected businesses with which Deutsch has had little or no prior relationship, and no plans of creating one in the future, and which have deficient parking lots and/or thresholds. In many instances, the most interaction Deutsch has ever had with the defendant was to look at the business's

15

parking lot from his car. To hold that such a minimal relationship to a business is sufficient to defer standing on Deutsch to sue that business would be to stretch the notion of standing past the breaking point. And while there is no doubt that a "tester" plaintiff can have standing under the ADA, *Betancourt*, 735 F.Supp.2d at 605, Deutsch is far from being a "tester." He sued 385 business in 306 days (and those 306 days include all of the intervening Saturdays, Sundays and holidays when the courthouse was closed). He did not provide the businesses pre-suit notice or allow them to cure the deficient parking before suing, and his attorney demanded payment of thousands of dollars in attorney's fees before he would dismiss the suits, even when the problems were quickly remedied. *See, e.g.*, Dkt. No. 6-1. While the ADA does not require notice and an opportunity to cure before suit is filed, that does not mean these facts have no relevance to the overall assessment of Deutsch's intentions, which are "front and center" in this analysis. As noted above, under either of the competing ADA standing doctrines, an "intent to return" to the business is required. Reviewing all of the evidence before it, the Court concludes that Deutsch has failed to establish any credible evidence that he had an intention of ever patronizing the Color at Dawn salon, the Austin Shoe Hospital, or Boomerz. Rather, it appears quite clear that Deutsch's sole intent in this campaign of litigation (an intent shared by his attorney) is to collect as much money as possible from the defendants, without ever setting foot in their premises.

      For these reasons, Deutsch has failed to demonstrate he has suffered an "actual or imminent" injury that is not merely "conjectural or hypothetical," or that he has "concrete plans" to patronize the businesses in the future. He therefore lacks standing to pursue these suits, and they should be dismissed pursuant to FED. R. CIV. P. 12(b)(1).

## IV.  RECOMMENDATION

The undersigned **RECOMMENDS** that the District Judge **GRANT** Defendant Paul Bo Yu, et al.'s Motion for Summary Judgment (Dkt. No. 14), as to the issue of standing, and **DISMISS** all federal claims against the Defendants on that ground.  The Court **FURTHER RECOMMENDS** that, pursuant to 28 U.S.C. § 1367(c)(3), the District Judge decline to exercise supplemental jurisdiction over the state law claims and **DISMISS WITHOUT PREJUDICE** all such claims. **FINALLY**, it is **ORDERED** that this cause of action be **REMOVED** from the docket of the undersigned and returned to the docket of the Honorable Robert Pitman.

## V.  WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 21st day of September, 2016.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE